UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOHN KNOX and ERIN ESPARZA, individually and on behalf a class of similarly situated individuals, | ) ) ) ) | |
| | ) | No. |
| | ) | |
| Plaintiffs, | ) ) | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| v. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |
| M-QUBE, INC., a Delaware corporation, | ) ) | |
| | ) | CLASS ACTION |
| Defendant. | ) ) | |

**07 CA 10124 NMG**

-----------------------------------------------------------------x

## CLASS ACTION COMPLAINT

MAGISTRATE JUDGE

Plaintiffs John Knox and Erin Esparza ("Plaintiffs"), on behalf of themselves and a class

of similarly situated individuals, bring this class action against m-Qube, Inc. ("m-Qube") seeking

to stop m-Qube's unlawful practice commonly referred to as "cramming," that is, causing

cellular telephone customers to be billed for mobile content services that the customers did not

order. For their class action complaint, Plaintiffs allege as follows upon personal knowledge as

to themselves and their own acts and experiences, and, as to all other matters, upon information

and belief, including investigation conducted by their attorneys.

### NATURE OF THE CASE

1.      The increased use of cell phones has given rise to a new industry that

provides so-called "mobile content" services such as ringtones, jokes, news, games, and daily

horoscopes to cell phone users. The providers of mobile content (the "mobile content

providers") charge for their services and cause such charges to be placed directly on customers'

cell phone accounts through their wireless carriers (the "carriers"). The carriers then bill and collect such amounts, serving as partners in these transactions, retaining a portion of all revenue that they collect on account of mobile content services.

2.     Because most mobile-content providers are unable to establish a direct billing and content delivery relationship with the wireless carriers, they most often turn to one of a handful of companies -- self-proclaimed "enablers," including defendant m-Qube -- that act as powerful middlemen or "gateways," without whom the mobile content providers would be unable to provide and bill for their mobile content services. And, like the carriers themselves, enablers such as m-Qube keep a substantial share of the revenues resulting from these relationships. As the leading enabler, m-Qube has become one of the only viable options for hundreds, if not thousands, of mobile-content providers to sell their services to consumers nationwide.

3.     In acting as a bridge between the wireless carriers and the mobile-content providers, m-Qube chose to enrich itself with millions of dollars by exploiting a flaw in its system causing thousands of consumers to be regularly and unwittingly charged for services ordered, not by them, but by the previous owners of their cell phone numbers.

4.     m-Qube -- who, along with the content providers and telephone carriers, shares in the revenues generated from these improper billing services -- has profited enormously from its wrongful conduct in violation of the common law of (a) unjust enrichment, and (b) tortious interference with contract.

5.     Because of m-Qube's improper actions, Plaintiffs seek on behalf of themselves and the class members, money damages disgorgement, injunctive and declaratory relief, costs, and reasonable attorneys' fees.

## PARTIES

6.     Plaintiffs John Knox and Erin Esparza are citizens of Texas, residing in Nueces County, Texas.

7.     Defendant m-Qube, Inc. is a Delaware corporation with its principal place of business in the Commonwealth of Massachusetts.

## JURISDICTION

8.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because (a) at least one member of the putative class is a citizen of a state different from Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection applies to the instant action.

## VENUE

9.     Venue is proper in this district under 28 U.S.C. §§ 1391(a)(1) and 1391(a)(2).

## CONDUCT COMPLAINED OF

10.     m-Qube is a self-proclaimed leading "mobile channel enabler," helping companies develop, deliver, and bill for mobile software such as ringtones, horoscopes, news, and the like, (collectively,"content") to compatible mobile devices throughout the Commonwealth of Massachusetts and the nation.

11.     Through its technology platform, industry relationships and financial services, m-Qube has established itself as a one-stop shop for both carriers such as Verizon Wireless, and mobile content providers such as Opera Telecom USA, Inc., Buongiorno USA, Inc., Blinck Mobile Ltd., and Nevis Mobile, among others, empowering them to take advantage of cellular

00010703.WPD ; 1                                          -3-

telephony as a channel for delivering content and realizing revenue, while carving out a role for itself as a crucial middleman in this rapidly growing industry.

12.     In order to tap into the wireless content marketplace and make content services available to cell phone consumers, content providers must first obtain access to the cellular telephone carriers' mobile communications networks.

13.     Unable to obtain such access directly from the carriers themselves, content providers often turn to intermediaries such as m-Qube who maintain direct connections to the carriers' networks for content delivery and handle the content providers' billing arrangements with the carriers.

14.     In so doing, m-Qube allows its content provider partners "to focus on developing and marketing branded content, applications and programs while m-Qube manages the complex carrier relationships, distribution, billing and customer service."

15.     m-Qube has developed a vast distribution system that integrates into the networks of the nation's largest cellular telephone carriers, with direct connections to more than two-dozen carriers (its "carrier partners"), including Verizon, Cingular, Sprint Nextel, and T-Mobile, among others.

16.     As a result, m-Qube is able to deliver and bill for mobile content for more than 200 million wireless subscribers nationwide.

### m-Qube Has Billed And Collected Millions Of Dollars in Unauthorized Mobile Content Charges.

17.     While m-Qube charges its content provider partners some up-front fees, its revenue is primarily generated by transactions for which it, in concert with mobile content providers and carriers, charges cell phone subscribers. Each time one of its content-provider

partners issues a charge for its services   m-Qube causes the charge to be billed by the carrier to the cell phone account then associated with that phone number.

18.     When used in this way, cell phones accounts function similar to credit card accounts; however, they lack many of the security features of the latter.  In fact, virtually the only information mobile-content providers require in order to add a charge to a cell phone account is the cell phone number itself.

19.     The carrier then sends its usual monthly bill to the cell phone subscriber, which includes the charges for such mobile content.  The carrier collects, keeps its percentage share of the mobile content charge, and then remits the balance to both m-Qube and the mobile content provider.

20.     m-Qube has registered hundreds of millions of transactions and processed hundreds of millions of dollars over the years and has profited enormously from its arrangement with its carrier partners and its content provider partners.

### *m-Qube Exploits Recycled Numbers*

21.     As m-Qube knows, its carrier partners routinely "recycle" so-called "dirty" telephone numbers to their customers when they sign up for new cell phone service.  The numbers are "recycled" in that they were previously owned and/or used by other persons or entities.  The numbers are "dirty" in that they are encumbered with pre-existing billing obligations, for products and services authorized to be purchased, if at all, by the previous owners and/or users of those numbers.

22. One of m-Qube's larger content-provider partners, has publicly referred to the

charging of "refurbished numbers" as "mystery billing" and has acknowledged this to be its

"largest challenge":

> "Mystery" billing and refurbished phone numbers. This has become perhaps our
> largest challenge, and is something we are aggressively working to address with
> our carrier partners. We have found instances where customers have been charged
> when that customer acquired a "refurbished" mobile phone number from their
> carrier. A "refurbished" number is number given to a customer that was
> previously used by another of the carrier's subscribers. If the previous subscriber
> failed to cancel their ... subscription before giving up the number, the
> "refurbished" number will continue to be billed.

23. m-Qube has knowingly facilitated this illegal billing by, *inter alia*, actively

negotiating and creating relationships between the wireless telephone carriers, the mobile-content

providers and itself wherein (1) the mobile-content providers are not timely and accurately

informed when a telephone number is recycled; (2) the wireless telephone carriers are not timely

and accurately informed of the identity of the person who supposedly authorized to be billed for

such content and are not informed of the date that such authorization was obtained.

24. When a cell phone customer terminates his or her account, the relevant

wireless carrier typically takes the number previously associated with that account out of

circulation for a period as long as several months before making it available to a new customer.

25. During that time, m-Qube, because of its communications and relationship with

the wireless carrier, either knows or is reckless in not knowing when an identifying cell phone

number is no longer associated with its subscriber's account.

26.     Because of its communications and relationship with the mobile content
providers, m-Qube either knows or is reckless in not knowing when an identifying cell phone
number supposedly provided authorization to be billed for mobile content.

27.     m-Qube intentionally ignores this information so that it can continue to place
charges on cell phone bills, even after the numbers have been recycled.

28.     As a result, m-Qube has caused charges to be illegally inserted into customers'
billing statements for subscriptions authorized, if at all, by previous owners and/or users of the
telephone number.

29.     If m-Qube wanted to end this illegal billing, it could do so in an instant. All it
would have to do is ensure that both its carrier partners and content providers report to each other
and to m-Qube (1) the identity of the person who subscribed to the services in question, along
with the date of that subscription, and (2) the identity of the current owner of the phone number
in question, along with the date he or she obtained that number. If the identities do not match or
the dates are inconsistent (*i.e.,* the carrier's records show that the consent date came prior to the
date the current owner obtained his or her number), no charges would be included on the
customer's billing statement.

30.     Instead m-Qube has intentionally created and maintained a system where each
party is provided incomplete information or turns a blind eye to said information and thus can
claim (falsely) that the blame lies at the feet of another party.

31.     As a direct result,  m-Qube has profited enormously from these illegal practices,
all the while being able to maintain plausible deniability.

## THE FACTS RELATING TO THE NAMED PLAINTIFFS

32. On or about October 21, 2006, Plaintiffs, who are an unmarried couple, visited the store of an authorized Verizon Communications, Inc. ("Verizon") sales representative located in Nueces County, Texas to purchase new cell phone service for their personal use.

33. On that same day, in exchange for a Verizon "America's Choice II" service plan, Plaintiffs agreed to pay Verizon $80.00 each month for a period of 12 months.

34. Upon execution of their Service Agreement and activation of their cell phone account, Verizon provided Plaintiffs a ten-digit cell phone number.

35. Unbeknownst to them at the time, Plaintiffs received a "dirty" phone number -- one saddled with preexisting obligations, encumbrances and billing arrangements for products and services authorized to be purchased, if at all, by the previous owners and/or users of that number.

36. Beginning on October 22, 2006 (on or about the day the account was activated) and continuing through December 1, 2006, Plaintiffs' cell phone was sent multiple unwanted premium text messages by at least two of m-Qube's third-party content provider partners, Blinko and Opera Telecom USA, Inc., d/b/a Katazo ("Katazo").

37. At no time did Plaintiffs authorize the purchase of these products or services and at no time did Plaintiffs consent to having either Blinko or Katazo send text messages to their Verizon cell phone number.

38. Beginning with the first billing period and continuing throughout the relevant time period, m-Qube on behalf of itself, and on behalf of Blinko, Katazo and Verizon caused Plaintiffs to be billed multiple times on a near daily basis as reflected on their cell phone bill for so-called

"premium text message services" in amounts ranging from $0.50 to $9.99. Such charges were for so-called premium text message "Alerts" allegedly provided by Katazo and Blinko.

39.     For instance, on October 24, 2006, m-Qube caused Plaintiffs to be charged $9.99 for premium message services described as "42222 BlinkoClub - Buongiorno." Similarly, on the very same day, m-Qube also caused Plaintiffs to be charged $0.50 on three separate occasions for premium message services described as "59675 Katazo Alerts." This process was repeated several times during the relevant period, amounting to 124 combined charges in approximately 30 days. (Attached as Exhibit A is a redacted copy of the relevant charges.)

40.     A Verizon representative refused to provide Plaintiffs a credit for the unauthorized charges because it is Verizon's policy not to refund charges from third-parties (e.g., Blinko, Katazo, m-Qube). Verizon also informed Plaintiffs that they must have provided their consent to receive such premium text message services and to pay for them, because the third parties who were billing Plaintiffs would not be able to do so without demonstrating to the carrier that they had the billed party's advance consent.

41.     Thereafter, Plaintiffs contacted Katazo on or about December 11, 2006, Katazo provided Plaintiffs with Plaintiffs' purported authorization to purchase the products or services associated with the Katazo charges being billed by m-Qube.

42.     The purported authorization to be billed for such charges was supposedly obtained by Katazo from an unidentified person with the same telephone number later obtained by Plaintiffs. The date Katazo claims to have obtained Plaintiffs' authorization to charge their cell phone number was on July 8, 2005 - a date more than one year **prior** to the time that

Plaintiffs purchased their cell phone service, obtained the telephone number in question, and started receiving cell phone service at such telephone number.

43.     On information and belief, the date Blinko claims to have obtained authorization to bill Plaintiffs' cell phone number for the relevant charges also predates the date Plaintiffs purchased their cell phone service, obtained the telephone number in question, and started receiving cell phone service at such telephone number.

44.     m-Qube has additionally caused Plaintiffs to be charged for services provided by other content providers including Blinck Mobile, Ltd. and Nevis Mobile, Ltd., for which products or services Plaintiffs never gave their authorization.

45.     To date, Plaintiffs have not received credits for these charges which they never authorized and if they were authorized by anyone, were authorized by the previous owner(s) of their cell phone number.

46.     On or about December 14, 2006, a customer service representative of m-Qube confirmed that it caused these charges to be placed on Plaintiffs' cell phone bill and acknowledged that the previous owner of the telephone number may have authorized the charges. m-Qube has since confirmed that its policy is not to provide refunds.

## CLASS ALLEGATIONS

47.     Plaintiffs bring this action, pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), on behalf of themselves and a class (the "Class") consisting of all wireless telephone subscribers in the nation who were charged by m-Qube for products and services not authorized by the existing owner of the telephone number (the "Plaintiff Class" or "Class"), but, rather purportedly by a

prior owner or user of the number; provided, however, that the following are excluded from this proposed Class: (i) defendant, and (ii) any relative or employee of defendant.

48.     The Class consists of thousands of individuals and other entities, making joinder impractical, in satisfaction of Rule 23(a)(1).

49.     The claims of the representative Plaintiffs (hereinafter the "Plaintiffs") are typical of the claims of all of the other Class members.

50.     The Plaintiffs will fairly and adequately represent and protect the interests of the other Class members. The Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. The Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members, and have the financial resources to do so. Neither the Plaintiffs nor their counsel have any interests adverse to those of the other Class members.

51.     Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive, and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

52.     The Defendant has acted and failed to act on grounds generally applicable to the Plaintiffs and the other Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members.

53.     The factual and legal bases of Defendant's liability to the Plaintiffs and to the other Class members are the same, resulting in injury to the Plaintiffs and to all of the other Class

members. The Plaintiffs and other Class members have all suffered harm and damages as a result of all of the Defendant's unlawful and wrongful conduct.

54.       There are many questions of law and fact common to the Plaintiffs and the other Class members, and those questions predominate over any questions that may affect individual Class members within the meaning of Rule 23(a)(2) and 23(b)(3). Common questions include but are not limited to the following:

(a)       Whether m-Qube has unjustly received money belonging to Plaintiffs and the Class and whether under principles of equity and good conscience, m-Qube should not be permitted to retain it;

(b)       Whether m-Qube tortiously interfered with Plaintiffs' and the Class members' contracts with their cellular telephone carriers by causing them to be charged for products and services by their carrier that were authorized, if at all, by the previous owner(s) and/or user(s) of their telephone number.

## COUNT I

### (Unjust Enrichment)

55.       Plaintiffs incorporate by reference the foregoing allegations.

56.       A benefit has been conferred upon m-Qube by Plaintiffs and the Class. m-Qube has received and retains money belonging to Plaintiffs and the Class resulting from its billing and collecting of millions of dollars in unauthorized third party mobile content charges, and in particular, its practice of systematically, repeatedly and without authorization, causing Plaintiff and the Class of cellular telephone customers to be billed by their cellular carriers for mobile

content services authorized to be purchased, if at all, by the previous owners and/or users of such telephone numbers.

57.    m-Qube appreciates or has knowledge of said benefit.

58.    Under principles of equity and good conscience, m-Qube should not be permitted to retain the money belonging to Plaintiffs and the Class which m-Qube has unjustly received as a result of its actions.

## COUNT II

### (Tortious Interference with Contract)

59.    Plaintiffs incorporate by reference the foregoing allegations.

60.    Plaintiffs and the Class had contractual relationships with their wireless carriers whereby they agreed to pay a certain sum of money in exchange for activation of their cell phone accounts and their carriers' promise to provide various communication and related services to Plaintiff and to bill Plaintiff and the Class only for products or services the purchase of which they had authorized.

61.    m-Qube knew of said contractual relationships.

62.    m-Qube intentionally interfered with said contractual relationships through improper motives and/or means by knowingly and/or recklessly continually causing to be placed on the cell phone bills of cell phone owners across the nation stale, out-dated and unauthorized charges.

63.    Plaintiffs and the Class suffered loss as a direct result of the conduct of m-Qube.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs John Knox and Erin Esparza, on behalf of themselves and the Class, pray for the following relief:

a)  That the Court certify this case as a class action and appoint John Knox and Erin Esparza as Class Representatives, and appoint Blim & Edelson, LLC and The Jacobs Law Firm, Chtd, as co-lead counsel;

b)  That the Court declare that the actions of m-Qube, as set out above, constitute unjust enrichment, and tortious interference with contract;

c)  That the Court enter judgment against m-Qube for all economic, monetary, actual, consequential, and compensatory damages caused by Defendant's conduct, and if Defendant's conduct is proved wilful award Plaintiffs and the Class exemplary damages;

d)  That the Court award Plaintiffs and the Class reasonable costs and attorney's fees;

e)  That the Court award Plaintiffs and the Class pre- and post-judgment interest, including interest not paid on any credits previously provided;

f)  That the Court enter judgment for an injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and the Class;

g)  That the Court award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiffs requests trial by jury of all claims that can be so tried.

Date: January 24, 2007

Respectfully submitted,

JOHN KNOX AND ERIN ESPARZA, individually
and on behalf of a class of similarly situated individuals

BY THEIR ATTORNEYS:

David Pastor (BBO # 391000)
Douglas M. Brooks (BBO # 058850)
Gilman & Pastor, LLP
225 Franklin Street, 16th Floor
Boston, Massachusetts 02110
Telephone: (617) 742-9700
Telefax: (617) 742-9701

Of Counsel:

John Blim
Jay Edelson
Myles McGuire (Of Counsel)
Blim & Edelson, LLC
53 West Jackson Boulevard
Suite 1642
Chicago, Illinois 60604
Telephone: (312) 913-9400
Telefax: (312) 913-9401

John G. Jacobs
Bryan G. Kolton
The Jacobs Law Firm, Chtd.
122 South Michigan Avenue
Suite 1850
Chicago, Illinois 60603
Telephone: (312) 427-4000
Telefax: (312) 427-1850